UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DANIEL YAW KANKAM,
*Petitioner*,

v.                                              1:23–cv–01313–MSN–JFA

CHADWICK DOTSON,
*Respondent.*

## MEMORANDUM OPINION

Daniel Yaw Kankam ("Petitioner"), a Virginia inmate proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his December 4, 2019 convictions in the Circuit Court for the City of Alexandria, Virginia for first–degree murder and use of a firearm in the commission of murder. (ECF 1). The petition was deficient and Kankam was given leave to file an amended petition. (ECF 6). Kankam filed an amended petition on December 18, 2023, with a memorandum in support. (ECF 8, 9).[1] The respondent filed a Rule 5 answer and a motion to dismiss, with supporting briefs and exhibits. (ECF 12–15). Kankam responded. (ECF 21).[2] Accordingly, this matter is now ripe for disposition. For the reasons that follow, the respondent's motion to dismiss will be granted and the petition will be dismissed with prejudice.

## I.    Procedural History

Kankam is detained pursuant to a final judgment of the Circuit Court for the City of Alexandria. On September 23, 2019, a jury convicted Kankam of first–degree murder, in violation

---

[1] Petitioner's amended petition is deemed timely filed, and therefore his Motion for an extension of time, (ECF 7), will be denied as moot.

[2] The response states it relies on the arguments in his petition and memorandum. (ECF 21 at 2).

of Virginia Code § 18.2–32; and use of a firearm in commission of a felony in violation of Virginia

Code § 18.2–53.1. (ECF 14–2). By final order dated December 4, 2019, the trial court imposed a

sentence of twenty–three years in prison for first–degree murder and three years in prison for the

firearm conviction. He was also sentenced to three years of post–release supervision. (ECF 14–

1).

Kankam, by counsel, filed a petition for appeal in the Court of Appeals of Virginia, which

listed four assignments of error:

    I.    The trial court erred in denying Appellant's Motion to Suppress Defendant's statements to the police that were involuntarily and made during custodial interrogation without administering *Miranda* warnings.

   II.    The trial court erred in denying Appellant's Motion to Strike the first–degree murder charge because the evidence was insufficient to prove deliberation and premeditation. As the evidence was insufficient to support a murder charge, the trial court further erred by failing to strike the firearm charge.

  III.    The trial court erred in denying Appellant's Motion to Strike the first–degree murder charge and the use of a firearm in commission of a murder because the evidence as to Appellant's identity as to both counts. was insufficient as a matter of law.

  IV.    The trial court erred in response to a jury question during deliberations in giving an answer that was nonresponsive and improperly invaded the province of the jury by directing their deliberations.

(ECF 14–3 at 16–17).[3] The petition was denied on November 5, 2020. The Court of Appeals'

denial order summarized the evidence in support of sufficiency as follows:

> Samiya Amrami was Ahmed's roommate in January of 2019. When [Somiya] Amrami got home from work after 11:00 p.m. on January 10, 2019 she heard Ahmed's voice and a male voice in Ahmed's bedroom. On the morning of January 11, 2019, Amrami did not, as she customarily did, hear Ahmed in the kitchen and preparing to leave for work. Ahmed did not appear for work as scheduled on January 11, 2019.
>
> Amrami noticed a bad smell when she returned home to the apartment at about 11:50 p.m. on January 11, 2019. Amrami entered Ahmed's bedroom and found

---

[3] Petitioner was represented by two attorneys at trial—Paul E. Pepper and Megan E. Thomas. The court appointed Tracy Ford to represent him on appeal.

her dead on the floor. The police received a 911 call about Ahmed's death at 11:53 p.m.

The police arrived at the apartment at around midnight on January 12, 2019. Ahmed's dead body was on the floor of her bedroom propped up against a dresser. Ahmed had died from a single gunshot wound inside her mouth. There was no gun or any fired ammunition components in the bedroom or the rest of the apartment. There was no sign of forced entry to the apartment. There were no sheets on Ahmed's bed, but the bed had been covered with a curtain; an apple was placed on the bed. There also was an apparent blood stain on the box spring of Ahmed's bed. The police seized Ahmed's cell phone from her bedroom. Boxes of ammunition were in a drawer and cabinet in the bedroom.

In the bathroom adjoining Ahmed's bedroom, the top of a liquid soap dispenser had been removed and the bottle was nearly empty. There was a red stain on the sink.

During the autopsy, no drugs or alcohol were detected in Ahmed's body. Ahmed had soot inside her right cheek, which was inconsistent with any self–inflicted intraoral gunshot wound the medical examiner had ever encountered. The trajectory of the bullet was angled, not fired straight up through Ahmed's hard palate. There was no stippling from gunpowder particles on the outside of the face. The medical examiner was unable to determine whether Ahmed's mouth was open or closed when the fatal gunshot was fired, but opined that the muzzle but the gun was inside her lips due to the lack of stippling on the outside of her mouth. The medical examiner did not notice any apparent defensive wounds on the body.

Gunshot primer residue was detected on Ahmed's hands following the autopsy. Testifying as an expert in the field of forensic analysis of gunshot residue, Douglas DeGaetano opined that gunshot primer residue could be deposited on a person's hands by firing a gun, being in proximity to a gun when it is fired, or having contact with something with primer residue on it.

Ahmed's cell phone contained a video that was recorded at 3:51 a.m. In the recording, which lasted almost 16 minutes, Ahmed is heard slapping appellant and accusing him of being drunk. Ahmed told appellant that he needed to wake up because she wanted him to leave. Instead, appellant consumed more alcohol. At the time, appellant was wearing his security detail uniform and had a gun holstered to his leg. At one point during the video, appellant did pushups.

Appellant appeared at the home of Kate Acheampong between 6:30 and 7:00 a.m. on January 11, 2019. Acheampong's husband, John Kankam (John), was appellant's nephew. Appellant gave Acheampong a black trash bag, asked her to keep it for him, and said he would return to pick it up. Appellant did not appear to be under the influence of alcohol at that time. Achaempong put the bag in a closet, and, by telephone, told appellant's wife to retrieve the bag. Appellant's wife subsequently advised Achaempong that appellant was sending someone over to pick up the bag. Two days later, Achaempong gave the bag to Supreme Aples, a police informant, in the parking lot of her apartment complex.

From jail, appellant called a female on January 13, 2019. Appellant advised that he wanted his "late sister's child" to pick up and hide something. Appellant mentioned that he was hiding something from the police.

Aples, who worked for appellant's company as a security guard, received text messages from appellant's wife on January 13, 2019. Aples advised the police about the communication. Under police surveillance, Aples retrieved the black garbage bag from Achaempong and he delivered it to the police.[4] Inside the bag was a disassembled Glock 17 firearm, a magazine containing ammunition, a single fired cartridge casing, a Smith and Wesson firearm, a bulletproof vest, a pair of tan pants with red stains, black shirts, a black knit hat, Ahmed's wallet, and two watches. DNA testing showed that Ahmed's blood was on the bulletproof vest from the trash bag, as well as the stain on her bed.

A photograph of appellant taken at January 11, 2019 at 4:32 a.m., apparently in Ahmeds's bedroom, was recovered from appellant's cell phone. In the photograph, appellant was wearing clothing similar to that recovered by the police in the garbage bag. In addition, from about 4:40 a.m. to 6:00 a.m. on January 11, 2019, appellant sent Ahmed text messages twenty–seven times asking if he could visit her and about other things.

Ahmed's phone contained a second video involving appellant that was recorded on September 30, 2018 at 9:43 a.m. In the video, Ahmed accused appellant of being drunk; appellant said that Ahmed was making him angry, he brandished a gun at her, and said, "I'm about to f****** kill you."[5]

In November 2018, appellant's cell phone sent a text message to Ahmed's phone stating that she had wronged him, she would regret it, and she should apologize. Later that month, appellant texted Ahmed that he would be her "worst enemy," and threatened that he would make her "lose her stay in (the) USA." More threatening text messages from appellant to Ahmed followed in December.

On January 1, 2019, appellant texted Ahmed to "go die, b****" after he refused to turn over her medical insurance card. He sent her 226 more text messages before she responded to him. Eventually, Ahmed texted appellant to "leave (her) alone." Ahmed said that she was going to find a "serious relationship" and have children. By text, appellant told Ahmed that he wanted her to return two watches and a bulletproof vest.

The police searched appellant's car on January 16, 2019. The police seized a portion of the driver's seat belt for DNA analysis. A ballistic vest was found in the trunk of the car.

Appellant could not be eliminated as a major contributor to the DNA mixture profile found on the disassembled Glock recovered from the trash bag. Within the blood stains that were on the Glock, Ahmed could not be eliminated as a major contributor to the DNA profile, while appellant was eliminated as a major

---

[4] The police paid Aples $10,000 for his assistance in this case. (Footnote number 3 in the original order).

[5] Appellant testified that the comment during the video was only a joke. (Footnote number 4 in the original order).

contributor. In a DNA mixture found near the trigger guard on the gun, Ahmed could not be eliminated as a major contributor, and appellant could not be eliminated as a minor contributor. Neither appellant nor Ahmed could be eliminated as a contributor to the DNA mixtures on the seatbelt from appellant's car and on the Smith and Wesson firearm found in the garbage bag.

Forensic testing proved that the cartridge case found in the garbage bag had been fired from the Glock firearm also recovered from the bag. The amount of pressure required, or "trigger pull," to fire the Glock was six and one–quarter pounds.

At the time of her death, Ahmed, who was Egyptian, was seeking asylum in the United States and she was very determined and hopeful for a positive outcome in the legal proceedings. Ahmed had applied for a position at another security company, and she had a job interview scheduled for January 16, 2019. Ahmed had a life insurance policy with a death benefit of $25,000 with appellant as the sole beneficiary.

Testifying in his own behalf, appellant stated on the night before Ahmed died, he and Ahmed left Twist Café after working a security detail there. Appellant said that he drank brandy when he drove to Giant, where they stopped to get Ahmed something to eat.[6] They reached Ahmeds's apartment at about 2:00 a.m. Appellant said that he dropped her off there, met Aples to recover a gun Aples had used for that night's security detail at Twist, and took that gun to Appellant's house for storage.[7]

At that point, appellant claimed, he drove back to Ahmed's apartment at around 4:00 a.m. Appellant had left the door to the apartment building propped open, and Ahmed's apartment door was unlocked. Appellant said that he had continued to drink brandy during his travels that night. However, appellant admitted that he was not very drunk when he reached Ahmed's apartment.

At Ahmed's apartment, appellant drank and went to sleep in Ahmed's bedroom, and she slapped at him to wake him. At one point he crawled on the floor toward Ahmed, then did pushups to sober himself up. Appellant stated that he was drunk at that time. Appellant crawled back to the bathroom and closed the door slightly. Appellant heard a sound, but he did not think it was a gunshot. He claimed to have found Ahmed, who was shot and bleeding from her mouth, on the floor of her bedroom.

Appellant said that he was confused about what had happened and that he panicked. Appellant took another drink and smoked a cigarette. Appellant gathered the empty alcohol bottles in Ahmed's bedsheet for disposal, and reholstered his gun, which was in Ahmed's lap.

---

[6] Surveillance cameras at the Giant grocery store recorded appellant and Ahmed there together at 11:45 p.m. on January 10, 2019. (Footnote number 5 in the original order).

[7] Aples testified that appellant did not appear intoxicated during the gun exchange at about 3:00 a.m. on January 11, 2019. (Footnote number 6 in the original order).

Appellant dismantled the Glock, put it in the garbage bag, and left the bag with Achaempong. Appellant claimed that he planned to reclaim the bag and go to the police when he was no longer intoxicated.

Appellant admitted that, when he asked the police what happened to Ahmed, he already knew that she was dead. He admitted that he initially lied to the police during the interview.

Dr. David Fowler, testifying as an expert in the field of forensic pathology, opined that an abrasion found on Ahmed's left finger was consistent with contact with the front sight of the semiautomatic firearm. Fowler stated that such contact tended to show that the injured hand was holding the gun when it was fired. Fowler further opined that if the gun had not been inside Ahmed's mouth, he would have expected to find stippling on the face and lips.

John testified that he went to appellant's home at about 6:00 p.m. on January 11, 2019. At that time, John said, appellant was drunk and crying.

(ECF 14–4 at 33–38).

The denial order found that Kankam "obviously lied" to the police about the murder and that his "guilt was supported by his failure to call 911 to report Ahmed's death, cleaning the crime scene, disposal of the evidence, and sending Ahmed numerous text messages to represent that he did not know she was dead." (ECF 14–4 at 39). The denial order further rejected Kankam's argument that the evidence was insufficient to convict him because his intoxication rendered him incapable of premeditation, finding that while there was evidence that Kankam had been drinking the night of the murder, the evidence established he was not intoxicated and unable to premeditate the killing. (*Id.* at 40–41). The denial order also found that Kankam's argument regarding the question the jury sent to the trial court during their deliberations—"that the jury's question reflected confusion about the Commonwealth's burden of proving the elements of the offense and the defense of intoxication . . . resulted in impermissible burden shifting with regard to the intoxication defense," (*Id.* at 41)—was defaulted pursuant to Rule 5A:18 because it was not the

same argument that he had made at trial. (*Id.* at 42).[8] A three–judge panel adopted the November 5, 2020 order denying the petition for appeal on January 15, 2021. (*Id.* at 54).

Kankam, by counsel, filed a petition for appeal in the Supreme Court of Virginia that raised the first three assignments of error raised in the Court of Appeals of Virginia, but not the fourth assignment of error that concerned the trial judge's response to the jury's question. (ECF 14–5 at 6). The court refused the petition in a summary order dated September 20, 2021. (*Id.* at 71).

On August 11, 2022, Kankam, proceeding *pro se*, filed a petition for a writ of habeas corpus in the Supreme Court of Virginia, (ECF 14–6), which raised the following claims:

a. Due Process Violations

    i.    The Commonwealth . . . violated Daniel Y. Kankam's due process rights by tampering with evidence, i.e., the official Report of Autopsy that was admitted into evidence.

    ii.    The Commonwealth violated Daniel Y. Kankam's due process rights by electing not to scientifically (test) critical evidence which possibly had exculpatory value.

    iii.    The Commonwealth violated Daniel Y. Kankam's due process rights when the Commonwealth consistently and repeatedly misrepresented in its case–in–chief that the khaki pants belonging to the defendant were stained with blood.

    iv.    The Commonwealth violated Daniel Y. Kankam's due process rights when it engaged in a total rewrite of the original voluntary intoxication instruction which was confusing, inaccurate, and misleading.

b. Ineffective Assistance of Counsel

    i.    Trial counsel's assistance to Mr. Kankam was constitutionally deficient because trial counsel failed to object (to) the admission of the redacted Report of Autopsy that was submitted to the jury as evidence under CW Ex. #7–001.

---

[8] The denial order also held that the assertion error regarding the trial court's denial of Petitioner's suppression motion was without merit because the record established that Petitioner was not subject to custodial interrogation before 12:56 p.m. on January 12, 2019. (*Id.* at 32).

    ii.    Trial counsel's assistance to Mr. Kankam was constitutionally deficient because trial counsel failed to subpoena Michelle Schepis, the Death Scene Investigator.

    iii.    Trial counsel's assistance to Mr. Kankam was constitutionally deficient because trial counsel failed to demand that several pieces of critical evidence be scientifically tested.

    iv.    Trial counsel's assistance to Mr. Kankam was constitutionally deficient because trial counsel failed to present expert testimony on blood spatter evidence.

c. Trial Court Errors[9]

    a)    The trial court erred in denying in part defendant's motion to suppress because the police obtained his statements in violation of his constitutional rights.

    b)    The trial court erred in denying the defendant's motion to suppress statements to police that were involuntary and made during a custodial interrogation without administering Miranda warnings.

    c)    The trial court erred in denying defendant('s) motion to strike the first–degree murder and the use of the firearm in the commission of a murder charge because the evidence as to defendant's identity as to both counts was insufficient as a matter of law.

    d)    The trial court erred in response to a jury question during deliberations in giving an answer that was nonresponsive and improperly invaded the province of the jury by directing their deliberations.

(ECF 14–6 at 6–15; 28–94). On August 22, 2023, the Supreme Court of Virginia dismissed the state habeas petition. (ECF 14–7).

**III. Federal Habeas Petition**

        On September 12, 2023, Kankam executed his federal petition for a writ of habeas corpus. To cure deficiencies in his petition, Kankam filed an amended petition December 8, 2023. (ECF 8).[10] The petition, as amended, raises four claims:

---

[9] The inconsistent manner in which the alleged claims of trial court error were designated is how Petitioner designated his claims.

[10] A district "court must consider claims as they are presented in the petition, reviewing them under the applicable standard" and it is "the district court's duty to consider only the specific claims raised in a § 2254 petition." *See Folkes v. Nelsen*, 34 F.4th 258, 269 (4th Cir. 2022) (citations omitted); *Frey v. Schuetzle*, 78 F.3d 359, 360–61 (8th Cir. 1996) ("(D)istrict courts must be careful to adjudicate only those claims upon which the petitioner seeks relief and take care not to decide claims upon which the habeas petitioner never intended to seek relief.").

1) "The trial court's response to a jury question constitutes 'burden shifting' in violation of the 14th Amendment's guarantee of due process." (ECF 8 at 6; ECF 9 at 6, 11).

2) "Trial counsel failed to properly object to court's response to a question by the jury violating the 6th Amendment of the United States Constitution." (ECF 8 at 7; ECF 9 at 5, 7).

3) "The prosecutors' discriminatory exclusion of African Americans from the petite jury violated the 6th Amendment of the United States Constitution." (ECF 8 at 6).

4) "Trial counsel's failure to object to the prosecutor's remarks during closing statements was ineffective" assistance of counsel in violation of the Sixth Amendment of the United States Constitution. (ECF 8 at 11; ECF 9 at 6, 14).[11]

## IV. Exhaustion And Procedural Default

Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court. *See* 28 U.S.C. § 2254(b); *Granberry v Greer*, 481 U.S. 129 (1987). To comply with the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Thus, a

---

[11] Petitioner set out six instances that he alleges counsel should have objected to during closing argument in his accompanying memorandum.

(a)      "Prosecutors contradictory statements evidence intent to mislead the jury." (ECF 9 at 16) (citing 9/20/2019 Tr. at 139, 157); (ECF 16-1 at 54, 72).

(b)      "Prosecutors intentionally claimed that defendant killed the deceased on the bed then moved her body knowing that no evidence supports that theory in an attempt to weaken the defendant's suicide defense." (ECF 9 at 17) (citing 9/20/2019 Tr. at 158–59, 161, 205, 207); (ECF 16-1 at 73–74, 76, 38, 40).

(c)      "Prosecutors deliberately made false statements that trial counsel knew and could prove were false nonetheless failed to object." (ECF 9 at 18) (citing 9/20/2019 Tr. at 158); (ECF 16-1 at 73).

(d)      "Prosecutors continued to refer to the defendant's bloody pants knowing the stains on the pants were never tested for blood." (ECF 9 at 18) (citing 9/20/2019 Tr. at 158); (ECF 16-1 at 73).

(e)      "Prosecutors made misleading interpretation of the deceased statements in the video knowing the evidence proves the meaning of those statements is the opposite." (ECF 9 at 18–19) (citing 9/20/2019 Tr. at 168); (ECF 16-2 at 1).

(f)      "Prosecutors made deceptive statements about the trigger knowing the trigger of the gun was never tested for fingerprints". (ECF 9 at 19) (citing 9/20/2019 Tr. at 173); (ECF 16-2 at 2, 6).

petitioner convicted in Virginia must have presented the same factual and legal claims raised in his § 2254 petition to the Supreme Court of Virginia. *See, e.g., Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Kasi v. Angelone*, 300 F.3d 487, 501–02 (4th Cir. 2002). The petitioner bears the burden of proving exhaustion. *See Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

Further, "(i)f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* "A habeas petitioner is barred from seeking federal review of a claim that was presented to a state court and clearly and expressly denied on the independent, adequate state ground of procedural default." *Bennett v. Angelone*, 92 F.3d 1336, 1343 (4th Cir. 1996) (internal quotation marks omitted); *see also Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991). A state procedural rule is "adequate" if it is firmly established and regularly or consistently applied by the state court and "independent" if it does not depend on a federal constitutional ruling. *Yeatts v. Angelone*, 166 F.3d 255, 263–64 (4th Cir. 1999). A petitioner must present his federal claims to the appropriate state court in the manner required by the state court, to give the state court "a meaningful opportunity to consider allegations of legal error." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986); *see also Castille v. Peoples*, 489 U.S. 346, 351 (1989) (raising a claim in a manner in which "the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor . . . does not, for the relevant purpose, constitute 'fair presentation.'"). Each of his claims are unexhausted.

Claim 1 alleges the trial court's response to a question from the jury violated his due process rights because it shifted the prosecution's burden on the elements of deliberation and premeditation. Kankam's fourth claim in his petition for appeal in the Court of Appeals of

Virginia asserted a similar "burden shifting" argument as error, (ECF 14–3 at 41), which the court found was barred by its Rule 5A:18 because the argument on appeal was not the same argument raised at trial. (ECF 14–4 at 42). Thereafter, in his subsequent petition for appeal in the Supreme Court of Virginia, Kankam's counsel did not include the burden shifting claim as an assignment of error. (ECF 14–5 at 6).

Kankam next raised the burden shifting claim in his state habeas petition, which was designated Claim (c)(d). (ECF 14–6 at 15). The Supreme Court of Virginia held that "claim (c)(d)" was barred pursuant to the rule of *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974) "because this non–jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus." (ECF 14–7 at 4). Because Claim 1 was raised "in a procedural context in which its merits w(ould) not be considered unless there are special and important reasons therefor . . . does not, for the relevant purpose, constitute 'fair presentation.,'" *Castille*, 489 U.S. at 351. Claim 1 is, therefore, unexhausted.

Kankam has raised two ineffective assistance of counsel claims in his federal habeas petition: Claim 2 alleges counsel was ineffective because he failed to properly object to the trial court's response to the jury's question; and Claim 4 alleges trial counsel was ineffective for not objecting to the prosecutor's closing argument. Although Kankam raised four claims of ineffective assistance of counsel in his state habeas petition, he did not raise either Claim 2 or Claim 4 in his state petition. (ECF 14–6 at 13–14, 28). Consequently, neither claim is exhausted.

Claim 3 alleges that the prosecutor discriminated against African Americans and excluded them from the jury, *i.e.* a *Batson*[12] claim. Kankam did not raise a *Batson* claim at trial, on appeal, or in state habeas, which means that it is not exhausted.

---

[12] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Nevertheless, a claim that has not actually been exhausted may be instead treated as exhausted but procedurally defaulted "if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000). Kankam could not have raised his four claims here before the Virginia courts at the time of his petition, because they would be barred as successive under Virginia Code § 8.01–654(B), as well as barred by the state statute of limitations, Virginia Code § 8.01–654(A)(2). Thus, although Kankam could not, "at the time of [his] federal petition," raise his claims in state court, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray v. Netherland*, 518 U.S. 152, 161-162 (1996);*see also Pope v. Netherland*, 113 F.3d 1364, 1372 (4th Cir. 1997) (holding that Virginia Code § 8.01-654(B)(2) is independent and adequate state law default); *Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 588 (E.D. Va. 2006) (holding that Virginia Code §§ 8.01–654(A)(2) and 8.01–654(B)(2) are independent and adequate state law defaults).[13]

### A. Cause and Prejudice

Federal courts may not review defaulted claims absent a showing of cause and prejudice, or a fundamental miscarriage of justice such as actual innocence. *Harris v. Reed*, 489 U.S. 255, 260, (1989); *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) ("To overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his claim.") (quoting *Coleman*, 501 U. S. at 750)). The

---

[13] Claims 1 and 3 would also be barred by the rule of *Slayton v. Parrigan* because the claims were not raised at trial and pursued on direct appeal. *Slayton v. Parrigan* is also an adequate and independent state law ground that precludes federal review. *See Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006).

existence of cause ordinarily turns upon a showing of (1) a denial of effective assistance of counsel, (2) a factor external to the defense which impeded compliance with the state procedural rule, or (3) the novelty of the claim. *See Coleman*, 501 U.S. at 753–754; *Clozza v. Murray*, 913 F.2d 1092, 1104 (4th Cir. 1990). A court need not consider the issue of prejudice in the absence of cause. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1359 (4th Cir. 1995).

In his response to the motion to dismiss, despite having raised four claims, Kankam asserts he only "raised (3) claims" in his federal petition. (ECF 21 at 1); *Folkes*, 34 F.4th at 269 (district "court must consider claims as they are presented in the petition, reviewing them under the applicable standard" and it is "the district court's duty to consider only the specific claims raised in a § 2254 petition."). The response argues the "first issue" alleges counsel was ineffective for "fail(ing) to object during trial." (*Id.*). Kankam's response, however, does not identify what counsel failed to object to even though he avers that he exhausted this claim in state court and it was "reviewed . . . on the merits." (*Id.*). Kankam's federal petition raises two allegations of ineffective assistance of counsel: 1) Counsel was ineffective for not objecting to the trial court's response to the jury instruction (Claim 2); and 2) counsel was ineffective for not objecting to the prosecutor's closing argument (Claim 4). Regardless of his assertion in his response that his claim of ineffective assistance of counsel was reviewed on the merits, the record establishes that Kankam did not raise either Claim 2 or Claim 4 in his state habeas proceeding. Hence, neither claim was reviewed on the merits.

Although ineffective assistance of counsel may be sufficient to establish "cause" to excuse a default, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 480 (E.D. Va. 2005),

> (W)here a petitioner for federal habeas relief seeks review of claims defaulted
> during state habeas proceedings, he must show that he raised the ineffectiveness

13

> argument as a cause for the defaulted substantive claims during his state habeas
> proceedings. If a petitioner did not raise the ineffectiveness claim at the state habeas
> level, a federal habeas court may not consider it. *Edwards*, 529 U.S. at 452–53.

*Powell v. Kelly*, 531 F. Supp. 2d 695, 723 (E.D. Va. 2008), *aff'd*, 562 F.3d 656 (4th Cir. 2009). As established by the record of the state habeas proceedings, Kankam failed to raise his alleged federal ineffective assistance of counsel claims in his state habeas petition, and neither Claim 2 nor Claim 4 can establish cause to excuse his default as to either claim.

Kankam next argues that his "second issue," is the allegation that "the trial court's response to jury question shifted the burden from the Commonwealth to the petitioner the element of the offense beyond a reasonable doubt in violation of the Sixth Amendment guarantee of due process." (*Id.*). What he refers to as his "second issue" was labeled as Claim 1 in his petition. Kankam argues as cause to excuse his default pursuant to *Slayton v. Parrigan* that he "was unable to exhaust [Claim 1] due to the state procedural rule established in *Slayton v. Parrington*, 205 S.E.2d 680, 682 (1974), that failure to raise an issue on appeal precludes raising the issue on habeas corpus. As a result, the state court remedy was unavailable for exhaustion for [Claim 1] in my petition." (*Id.* at 1–2). His circular argument has no merit.

Cause excuses the failure to raise a claim during a state proceeding if "the factual or legal basis for (the) claim was not reasonably available." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Here, the record establishes that an objection was made at trial to the trial judge's response to the jury's question, but the argument raised on appeal was not the same argument raised at trial. In sum, the argument could have been raised at trial and pursued on appeal. Accordingly, Kankam has not established cause for Claim 1.[14]

---

[14] To the extent petitioner may be asserting counsel was ineffective for not raising the "burden shifting" objection at trial as cause, the claim was not raised in state habeas and may not serve as cause to excuse his default. *See Powell*, 531 F. Supp. 2d at 723.

The remaining claim raised in the federal petition, Claim 3, alleges that the prosecutor discriminated against African Americans and excluded them from the jury, *i.e.* a *Batson* claim.[15] Kankam did not raise a *Batson* claim at trial, on appeal, or in state habeas. Further he does not address the default in his response. The only arguable assertion of cause is in his amended petition where he alleges that his "attorney was ineffective when assisting (him) with this issue() on appeal." (ECF 8 at 9). The record in this case, however, does not indicate there was any basis for raising a *Batson* challenge at trial, and since none was raised at trial, the claim would have been defaulted on appeal. *See Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) ("Counsel is not required to make futile objections or motions."); *Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) ("Counsel is not required to engage in the filing of futile motions.").

B. *Martinez v. Ryan, 566 U.S. 1 (2012)*

*Martinez* recognized a narrow exception for defaulted claims of ineffective assistance of counsel in a state, such as Virginia, where a prisoner is not allowed to raise an ineffective assistance of counsel claim on direct appeal.

> a prisoner may establish cause for a default of an ineffective–assistance (of trial counsel) claim . . . where the state courts did not appoint counsel in the initial–review collateral proceeding . . . (or) where appointed counsel in the initial–review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland*.

---

[15] A *Batson* challenge requires a court conduct a three-step inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006). First, the trial court must determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S., at 96–97. Second, if the showing is made, the burden shifts to the prosecutor to present a race–neutral explanation for striking the juror in question. *Id.* at 97–98. Although the prosecutor must present a comprehensible reason, "(t)he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson,*476 U.S. at 98. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768.

566 U.S. at 15. To establish cause, a prisoner must "demonstrate that the underlying ineffective–assistance–of–trial–counsel claim is a substantial one . . . that the claim has some merit." *Id.*; *see also Trevino v. Thaler*, 569 U.S. 413, 423 (2013). *Martinez* is only applicable to ineffective assistance of trial counsel claims, and it is not applicable to either prosecutorial misconduct claims, *see Hunton v. Sinclair*, 732 F.3d 1124, 1126–27 (9th Cir. 2013) (refusing to extend *Martinez* to a *Brady* claim defaulted by state post-conviction counsel), or claims of ineffective assistance of appellate counsel, *Davila v. Davis*, 582 U.S. 521, 529 (2017) (declining to extend the *Martinez* exception to defaulted claims of ineffective assistance of appellate counsel).[16] *Strickland* recognizes a strong presumption that counsel's performance, especially regarding trial management and strategy, was within the range of reasonable professional assistance. *Id.* at 689. To demonstrate prejudice, petitioner must show there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. *Id.* at 694. Kankam's defaulted ineffective assistance of counsel claims are not substantial.

1. Claim 1, Jury Question and Response. Kankam acknowledges that counsel raised several objections during the discussion of the trial court's various versions of a response. During deliberations, the jury sent a question to the trial judge:

> Absent a finding that the defendant was so greatly intoxicated by the voluntary use of alcohol that he was incapable of deliberating or pre–meditating, [Jury Instruction No. 19,] may intoxication be considered in determining whether the Commonwealth has met its burden in establishing element 3 of 1st degree murder: "willful, deliberate and pre-meditated"?

(CCT at 929).[17] During the discussion of the answer by the trial judge, the prosecutor and defense

---

[16] *See Moseley v. Clarke*, 3:19cv40, 2019 U.S. Dist. LEXIS 152405, *33 n.6 (E.D. Va. Sept. 5, 2019) ("To the extent that Moseley faults appellate counsel for the default of his claim, the explicit language of *Martinez* applies to an inmate's default of a claim of ineffective assistance of trial counsel only . . . . Thus, the ineffective assistance of appellate counsel fails to serve as the cause for the default of this claim") (citation omitted), *appeal dismissed*, 791 F. App'x 428 (4th Cir.), *cert. denied*, 141 S. Ct. 301 (2020).

[17] References to the circuit court manuscript record are designated by "CCT at ___."

counsel, trial counsel raised several issues before the final version of the response was determined.

Trial counsel suggested to the trial judge that the jury be told "that they're governed by the instructions, and intoxication is a defense if he's unable to premeditate or deliberate," and that "it's still . . . the Commonwealth's burden to" prove premeditation and deliberation "beyond a reasonable doubt." (ECF 15–2 at 4–5). The trial judge responded, "There's no question. We understand that." (*Id.*). Observing the jury had been given instructions listing the elements of first–degree murder, second–degree murder, and setting forth the defense of voluntary intoxication, the trial judge then proposed the answer to the question should be "No." (*Id.* at 6–8). Trial counsel disagreed and responded that the proposed answer should not be "No" but "Yes." (*Id.* at 9). Continuing, counsel stated, "this may be a struggle on who has the burden, who has to prove what. . . . [and] the Commonwealth still has the burden to prove beyond a reasonable doubt that the killing was willful, deliberate and premeditated," adding that answering "No" "signal(ed)" to the jury that the Commonwealth did not have the burden to prove "all three of those elements . . . ." (*Id.* at 10–11).

Kankam acknowledges the "ample debate" between his counsel, the prosecutor, and trial judge as to the response, (ECF 9 at 10), and that during that "ample debate," trial counsel raised the issue that the jury's question could indicate possible confusion over the prosecution's burden, and whether the jury's finding of intoxication had to be "beyond a reasonable doubt." (ECF 15-2 at 10). As noted, during the discussion trial counsel, the prosecutor, and the trial judge referenced other instructions that were given, and to address the concern about who had the burden of proof, the trial judge's eventual proposed response reiterated that the prosecution had "the burden of proving each element of any alleged offense by proof beyond a reasonable doubt." (*Id.* at 13). At this point in the discussion, the response had not been reduced to writing. After some additional

discussion and wordsmithing, (*id.* at 14-19), the trial judge's new proposed answer was reduced to writing:

> The government has the burden of proving each element of any alleged offense by proof beyond a reasonable doubt. The intoxication defense shall only be considered by you in determining whether the Defendant, as a result of the voluntary consumption of alcohol had at the time of the killing the capability of deliberating or premeditating.

(CCT at 929). Counsel then stated their objection, for the record, that the new proposed response "instructs the jury essentially how to do their deliberations," and by including the word "only" "directs the jury to deliberate in a certain way." (ECF 15-2 at 25, 26).[18] While trial counsel had considered confusion over the burden of proof as an issue, their concerns in that regard were apparently diminished once the proposed response was reduced to writing and the objection to the actual response was more limited.

Kankam argues that although his attorneys raised several objections at trial, counsel were ineffective for not "object(ing) to inclusion of the word 'defense' after 'intoxication' or argu(ing) that including this word would 'impermissibly shift the burden of proof.'" (ECF 9 at 10). While he asserts that not raising an objection to the word "defense" in the proposed response amounted to ineffective assistance of counsel, he does not explain how that word shifted the Commonwealth's burden on the elements of the offense. (*Id.*).

---

[18] The record establishes that this is not a situation where counsel refrained from raising any objection. *See United States v. Mason*, 774 F.3d 824, 830 (4th Cir. 2014) ("Attorneys can be selective and strategic without risking an ineffective assistance of counsel claim... (because) (a)ttorneys exist to exercise professional judgment, which often involves setting priorities. Indeed, it can be positively detrimental to a client's chances not to set priorities but rather to scattershot the case by raising every objection at trial.") (internal citations omitted). In addition, to the extent Petitioner is asserting ineffective assistance of counsel because the word "only" was not struck from the response, the record is clear that trial counsel did raise that objection. If petitioner is attempting to raise a defaulted claim of ineffective assistance of appellate counsel for not pursuing the claim on appeal, however, *Martinez* is inapplicable to claims of ineffective assistance of counsel of appellate counsel. *See Davila*, 582 U.S. at 529 (declining to extend the *Martinez* exception to defaulted claims of ineffective assistance of appellate counsel);

First, counsel is not required to bring forth all conceivable objections. *See Mason*, 774 F.3d at 830 ("Attorneys can be selective and strategic without risking an ineffective assistance of counsel claim... (because) (a)ttorneys exist to exercise professional judgment," observing "it can be positively detrimental to a client's chances not to set priorities but rather to scattershot the case by raising every objection at trial.") (internal citations omitted); *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984) (the "right to effective assistance of counsel does not require counsel to raise every objection without regard to its merit."); *see also Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("(w)hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). The record establishes that counsel was aware of the potential for confusion over the burden of proof, and successfully advocated for a reiteration in the response given by the trial judge that emphasized that the prosecution had the burden of prove beyond a reasonable doubt each element of any alleged offense.

Second, consideration of a claim of ineffective assistance of counsel in the contest of an allegedly erroneous instruction "is viewed in the context of the entire charge." *Peterson v. Murray*, 904 F.2d 882, 888 (4th Cir. 1990) (citing *Cupp v. Naughten*, 414 U.S. 141, 146–147 (1973)); *see Fitzgerald v. Thompson*, 943 F.2d 463, 469 (4th Cir 1991) (ineffective assistance claim that counsel was ineffective for not objecting to a jury instruction requires federal court to view "the instruction on intent in the context of the entire case"). In context, as the discussion progressed and other portions of the entire charge to the jury were incorporated by the parties and the trial judge into their discussion, trial counsel changed the focus of their concern with respect to the trial judge's proposed response and advanced a more limited objection to the response—in which the trial judge reiterated the prosecution had "the burden of proving each element of any

alleged offense by proof beyond a reasonable doubt." (CCT at 929). The discussion on the response to the jury's question included recognition that other instructions were relevant, particularly with regard to the prosecution bearing the burden of proof with respect to each and every element of each offense beyond a reasonable doubt. The following portions of instructions given to the jury, to which there was no objection at trial or in the post–conviction proceedings, included the following:

> *Instruction No. 1*. Presumption of Innocence (. . . . "This presumption of innocence remains with the defendant throughout the trial and is enough to require you to find the defendant not guilty unless and until the Commonwealth proves each and every element of the crime beyond a reasonable doubt . . . ."). (CCT at 895).
>
> *Instruction No. 9*. First–Degree Murder (". . . . The Commonwealth must prove beyond a reasonable doubt each of the following elements . . . (1) That Daniel Kankam killed Somaya Hussein Ahmed; and (2) That the killing was malicious; and (3) That the killing was willful, deliberate and premeditated. If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of (first–degree murder), then you shall find Daniel Kanam guilty of first–degree murder . . . . If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the first two elements of (first–degree murder) but you do not find beyond a reasonable doubt that the killing was willful, deliberate and premeditated, then you shall find Daniel Kankam guilty of second–degree murder . . . ."). [19] (*Id.* at 903–04).
>
> *Instruction No. 11*. Grade of Offense (". . . if you have a reasonable doubt as to the grade of the offense, then you must resolve the doubt in favor of Daniel Kankam and find him guilty of the lesser offense. . . . If you have a reasonable doubt as to whether he is guilty at all, you shall find him not guilty."). (*Id.* at 906).
>
> *Instruction No. 19*. Voluntary Intoxication ("If you find the defendant was so greatly intoxicated by the voluntary use of alcohol that he was incapable of deliberating or premeditating, then you cannot find him guilty of murder in the first degree. Voluntary intoxication is not a defense to second degree murder or voluntary manslaughter."). [20] (*Id.* at 914).

---

[19] Instruction No. 9 also includes the same reiteration of the prosecution's burden of proof with regard to voluntary manslaughter, and that if the Commonwealth "failed to prove beyond a reasonable doubt any of the above offenses, then you shall find Daniel Kankam not guilty." (*Id.* at 903–04).

[20] Instruction No. 17 instructed the jury that "'Willful, deliberate, and premeditate' means a specific intent to kill, adopted at some time before the killing, but which need not exist for any particular length of time." (*Id.* at 912).

When the instructions are viewed in the context of the entire charge, the trial judge's response did not result in any confusion about whether the prosecution had the burden to prove beyond a reasonable doubt each and every element of each offense charged. To the contrary, the response to the jury's question reiterated that the prosecution had "the burden of proving each element of any alleged offense by proof beyond a reasonable doubt," and that voluntary intoxication concerned with whether Kankam "at the time of the killing" had "the capability of deliberating or premeditating." (*Id.* at 929). In short, the response to the jury's question did not result in "burden shifting."

Under *Strickland*, counsel was not ineffective for not raising a burden shifting objection to the final version of the proposed response. Although counsel had initially expressed concern about the possibility there was confusion about the prosecution having the burden of proof during the discussion of the proposed response, that concern abated during the discussion, which included recognition of the other instructions that were part of the entire charge given to the jury by the trial judge. *See, supra* at 20-21. In addition, there is no "'reasonable likelihood' that the jury could have interpreted [the response] as relieving the prosecution of its burden." *Peterson*, 904 F.2d at 888 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)). With regard to *Strickland* prejudice, the evidence of guilt in this case was overwhelming and compelling, which included Kankam's lies to the police about the murder; his failure to call 911 to report Ahmed's death; his cleaning the crime scene; his disposal of evidence; and the numerous text messages he sent to Ahmed to provide him a basis to claim that he did not know she was dead. Accordingly, this is not a substantial claim of ineffective assistance of counsel and *Martinez* is not applicable.

2. Claim 4, Closing Argument. Kankam alleges six instances in which he claims counsel was ineffective for not objecting to the prosecutor's closing argument. *White v. Kiser*, No.

7:20cv199, 2021 U.S. Dist. LEXIS 153851, at *60 (W.D. Va. Aug. 16, 2021) ("Generally, whether and when to object to arguments of counsel are committed to the sound discretion of the attorney. Such strategically made choices are 'virtually unchallengeable.'") (quoting *Sigmon v. Stirling*, 956 F.3d 183, 195 (4th Cir. 2020)), *appeal dismissed*, No. 21-7255 2022 U.S. App. LEXIS 13059 (4th Cir. May 1, 2022). Each of his six allegations has no merit.

Initially, as a predicate for a claim trial counsel should have objected, Kankam must first establish prosecutorial misconduct. The Fourth Circuit has established a "two–prong test for determining whether a prosecutor's misconduct in closing argument "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). First, a defendant "must show" that the prosecutor's remarks "were improper;" and second "that they 'prejudicially affected the defendant's substantial rights so as to deprive (him) of a fair trial.'" *Wilson*, 135 F.3d at 297. A prosecutor, however, is not limited in closing argument to "merely" reciting "uncontroverted facts, but rather the prosecution may make fair inferences from the evidence." *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994) (citing *United States v. Brainard*, 690 F.2d 1117, 1122 (4th Cir. 1982) (stating that closing arguments may include reasonable inferences from the evidence).

Kankam first notes that the prosecutor ~~contradicted~~ made self-contradictory arguments by stating "the deceased put a 'hammer' in the defendant's face" then later states "the deceased in fact put a 'phone' in the defendant's face," and asserts the remarks were made to confuse the jury, were improper, and misleading. (ECF 9 at 16). The prosecutor, at best, misspoke when she said "hammer," and the jury was not misled. In each instance, the prosecutor was describing the

22

moments before Kankam unholstered his weapon and inserted it into the victim's mouth. Even if this constituted improper argument, which it does not, counsel was not ineffective for failing to object. An objection would have highlighted the manner in which the victim was murdered. *See Evans v. Thompson*, 881 F.2d 117, 125 (4th Cir. 1989) (trial counsel routinely chose not to object to the prosecutor's argument because an objection would only emphasize the matter before the jury and does not give rise to a claim under *Strickland*); *Moore v. United States*, 934 F. Supp. 724, 727 (E.D. Va. 1996) (finding that a failure to object to improper argument was a strategic decision meant to avoid drawing additional attention to the statements because it is often better for a defense attorney "to remain silent than to draw attention to a matter by offering an objection) (citing *Inge v. Procunier*, 758 F.2d 1010, 1016 (4th Cir. 1985));[21] *see also Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003) (counsel's decision to abstain from raising objections to avoid drawing additional attention to an argument or evidence is considered reasonable strategy"); *Hansford v. Angelone,* 244 F. Supp. 2d 606, 613 (E.D. Va. 2002) ("Constitutionally effective assistance does not require the assertion of every possible valid objection. Indeed, it is frequently better to remain silent rather than to draw attention to the matter.") (internal quotation marks and citations omitted).

Further, as noted previously, the evidence of guilt in this case was overwhelming and compelling. Kankam has failed to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

---

[21] In *Inge*, the Fourth Circuit stated that whether trial counsel "simply didn't think to object or deliberately did not object" to the improper conduct did not matter. 758 F.2d at 1016. *See Humphries v. Ozmint*, 397 F.3d 206, 234 (4th Cir. 2005) ("It is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under *Strickland*.").

The next allegedly improper argument was the prosecutor's theory that the victim had been shot on the bed and then moved to a sitting position on the floor in front of the TV to support the defense theory of suicide. (ECF 9 at 17). Kankam further argues that this improper argument "dissuade(d)" the jury from believing he "was too intoxicated to act deliberately and with premeditation if he did in fact kill the deceased." (*Id.*). The physical evidence established that there was a blood stain on the boxspring; the bed sheet and a blanket had been removed even though they were seen in the video filmed shortly before the victim's death; there was "(n)ot a speck of blood on" the TV and table directly behind where she was seated on the floor even though she was shot through her mouth; the bullet trajectory was also inconsistent with a straight shot because it was angled from right to left and slightly elevated. (ECF 16–1 at 73–74, 38–40). On cross-examination, Kankam was asked about the blood on the boxspring and was adamant that the victim was not on the boxspring, stating that the victim "wasn't anywhere close to. . . . this box spring thing . . . She was not anywhere close to it." (9/19/2019 Tr. at 253). Kankam responded he had "no idea how the blood could have possibly gotten on the bed," and when asked about the boxspring, he responded "No, No, No." (*Id.*). In addition, Kankam cleaned up the crime scene. Based upon the evidence, it was not an unreasonable inference for the prosecutor to argue that the victim's body had been moved from the bed and placed in an upright position—given the blood on the boxspring, the removal of the sheets and blankets, and the absence of blood spatter evidence around the victim. The prosecutor's argument was based upon inferences from physical evidence and was not improper. *See United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010) (rejecting defendant's argument the prosecutor's argument was improper because "there was evidence to support the" prosecutor's argument); *Fransico*, 35 F.3d at 120 ("the prosecution may make fair inferences from the evidence") (citing *Brainard*, 690 F.2d at 1122). Kankam has failed

24

to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

The third allegedly improper argument was the prosecutor's reference to expert testimony that supported the prosecution's theory that the victim was killed on the bed and her body was moved to a sitting position on the floor in front of the television. The expert's testified that "when a person is shot in the mouth, blood and body matter would be expelled with those gases from the firearm out of the mouth," but "no speck of blood got on the TV stand or the table that is right behind her." (ECF 9 at 18). This argument was also based upon inferences from the evidence and was not improper. *See supra* at 24-25. Kankam has failed to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

Kankam's fourth allegation argues that counsel should have objected to the prosecutor's reference to "bloody pants" in her closing argument because "the stain on the pants w[as] not tested to determine what the substance was that stained them." (EFC 9 at 18).[22] The "bloody pants" were in the bag of evidence Kankam removed from the apartment which Kankam was trying to hide from the police. When the bag was turned over to the police it contained "a disassembled Glock 17 firearm, a magazine containing ammunition, a single fired cartridge casing, a Smith and Wesson firearm, a bulletproof vest, a pair of *tan pants with red stains*, black shirts, a black knit hat, [the victim's] wallet, and two watches. DNA testing showed that [victim's] blood was on the bulletproof vest from the trash bag, as well as the stain on her bed." (ECF 14-4 at 35) (emphasis added).

---

[22] Testimony at trial explained that the investigators were looking for the presence of blood on the items in the bag and if blood was found, "additional evidence would not be tested." (9/18/2019 Tr. at 337–38). The vest was chosen for testing and the positive blood test was used "to develop a DNA profile." (*Id.* at 338).

Importantly, with respect to closing argument, at that point all of the evidence was available to the prosecutor—which included Kankam's testimony. During his testimony at trial, Kankam repeatedly admitted that the victim's blood was on/in his pants: that the victim's blood was "in his pants;" that the victim's blood was "in [his] pants;" that when he took the bag to Kate Acheampong he "realized there was a blood stain in my pants;" "my blood pants;" that Kate Acheampong did not ask him about the "blood on [his] pants;" (9/19/2019 Tr. at 181, 254, 255, 260, 283).[23] Consistent with his attempt to hide the pants and other items, Kankam admitted that he told the police that he was wearing the same pants he had on the night the victim died, which was not true. (*Id.* at 305–06). There was nothing improper about the prosecutor arguing Kankam's pants were bloody as Kankam himself admitted on repeated occasions during his testimony that his pants were bloody. This argument was also based upon inferences from the evidence and was not improper. *See supra* at 24-25. Kankam has failed to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

Next, Kankam alleges the prosecutor's closing argument was based upon a misleading interpretation of the victim's statement in the video: "the video from January 11, 2019 minutes before the defense claims that Ms. Ahmed shot herself, Ms. Ahmed is telling the defendant that he needed to go home because she needs to sleep and go to work the next morning." (9/20/2019 Tr. at 168). Kankam argues that because the victim was not a native English speaker, that what she was actually saying was different—because she was actually pleading with Kankam to stay

---

[23] Petitioner also testified about the bag and during his explanation of his "purpose" for taking the bag to Kate Acheampong, he referred to his "clothes that was bloody." (*Id.* at 184). Photographs of the blood stains on the pants were introduced at trial. (CCT 749–50, 753–54).

and not leave. (ECF 9 at 19). The record establishes the prosecutor's argument is supported by the evidence.

Kankam testified on his own behalf, and was questioned about the video. Kankam was asked if the victim told him "to leave and go home to your wife so that [the victim] could go to sleep because she had to work the next morning?" (9/20/29019 Tr. at 216). Kankam replied that the victim "probably" was also saying not "to leave her house." (*Id.*) The questioning continued with the prosecutor asking Kankam, "do you remember her saying, can you leave? I need to get some sleep. I have to work in the morning." Kankam replied, "From the video, I saw that, I heard that." (*Id.* at 216-17). Kankam allegedly did not remember the victim saying it to him, but he agreed "obviously," that the victim had said it. (*Id.* at 217).[24]

Kankam's own testimony, again, provided the basis for the prosecutor's reference that the victim wanted Kankam to leave. Kankam has failed to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

Kankam's last allegation of ineffective assistance of counsel for not objecting to the Prosecutor's closing argument, alleges the prosecutor made a deceptive statement that Kankam pulled the trigger, while the prosecutor knew "the trigger of the gun was never tested for fingerprints." (ECF 9 at 19). The forensic evidence introduced at trial established that the Glock 17 and a spent cartridge casing, as well as other items, were in the bag that Kankam took to Kate Acheampong. The spent cartridge was examined and the firearms expert opined that it had been fired by the Glock 17 that was found in the bag with the spent casing. The firearm examiner had

---

[24] The cross-examination on this point continued with petitioner admitting the victim had told him "to leave," and admitting that he did not "honor [the victim's] request." Petitioner had testified that he had planned to spend the night at the victim's apartment and that "leave, I don't like you, I'm done with you," were statements by the victim that he had heard 'all the time." (*Id.* at 218).

also test-fired the Glock 17 and determined that it was in working order once it was re-assembled. (9/18/2019 tr. at 87, 105). The bullet fragments recovered from the victim were consistent with having been fired from a Glock 17 but there were insufficient bullet fragments to determine if it was actually fired from the recovered Glock 17. The class characteristics of the bullet fragments, however, were consistent with having been fired from a Glock. (*Id.* at 104-08).

At trial, Detective Gill testified that Kankam admitted during his interview that he left his loaded Glock 17 with the victim in her apartment shortly before the murder. (9/19/2019 Tr. at 91-94). The defendant admitted he had his Glock 17 with him that night, that it was fully loaded, and that he had it in the victim's bedroom. (*Id.* at 193, 208, 218-19). On cross-examination, Kankam testified that he removed the Glock 17 from its holster and placed it on the sink. (*Id.* at 231). Kankam testified that when he exited the bathroom he found the victim on the floor by the TV with the Glock 17 on her leg, and that he picked it up and put it in his holster. (*Id.* at 261).

There was thus sufficient evidence to connect Kankam with the Glock 17, the Glock 17 to the victim's fatal wound, and—when considered with all of the evidence introduced at trial— that Kankam pulled the trigger that killed the victim. *See supra at 2-6.* Kankam has failed to state a claim of ineffective assistance of counsel under either prong of *Strickland,* much less a substantial claim of ineffective assistance of counsel. Consequently, *Martinez* is not applicable.

## V. CONCLUSION

For the foregoing reasons, respondent's Motion to Dismiss [Dkt. No. 12] will be granted, and the petition will be dismissed by an order to be issued with this opinion.[25]

                                                    /s/
                                              _____
                                              Michael S. Nachmanoff
                                              United States District Judge

August 30, 2024
Alexandria, Virginia

---

[25] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner fails to meet this standard.